First Division
June 30, 2006

No. 1-05-1526

FORTECH, L.L.C.,                          )
                                          )
    Plaintiff/Counterdefendant        )
                                          )
        v.                           )
                                          )
                                          )
R.W. DUNTEMAN COMPANY, INC., DU-KANE      )
ASPHALT COMPANY, INC., ALLAN J.           ) Appeal from
DUNTEMAN, and PAUL J. DUNTEMAN,           ) the Circuit Court
                                          ) of Cook County
    Defendants                        )
                                          ) 94 M1 704556
(Du-Kane Asphalt Company, Inc.,           )
                                          ) Honorable
    Counterplaintiff/Third-Party      ) Ronald F. Bartkowicz,
Plaintiff/Appellant;                      )  Judge Presiding
                                          )
K-Five Construction Company,              )
                                          )
    Third-Party Defendant/Appellee;   )
                                          )
Donald West,                              )
                                          )
    Third-Party Defendant).            )

    JUSTICE McBRIDE delivered the opinion of the court:

    Third-party plaintiff Du-Kane Asphalt Company (Du-Kane) appeals from the circuit court's order resolving cross-motions for summary judgment in favor of third-party defendant K-Five Construction Corporation, incorrectly sued as K-Five Construction Company (K-Five), as to Du-Kane's claims of conversion and unjust enrichment. K-Five was operating as an agent of Du-Kane's landlord in 1997 when it allegedly converted and was unjustly enriched by improving the rented real property with road construction material that Du-Kane had stockpiled at the site.

Du-Kane argues the circuit court determined an agent cannot be held liable for tortious conduct undertaken at its principal's direction, and that this determination was erroneous because conversion and unjust enrichment are strict-liability claims. Du-Kane also argues the circuit court further erred by disregarding clear evidence of K-Five's conversion and unjust enrichment. K-Five responds that Du-Kane has misconstrued the court's ruling and that the argument about an agent's liability in tort is misdirected because the cross-motions for summary judgment established Du-Kane would be unable to meet the elements of its two tort claims. K-Five argues the most conspicuous defects in Du-Kane's suit are that it no longer had a right to possess the real property and that the material at issue was essentially worthless debris which Du-Kane had abandoned.

The following pertinent facts are disclosed by the record. The road construction materials at issue were stored on real property owned by the Metropolitan Water District of Greater Chicago (District). The site consists of almost 21 acres in Lemont Township situated southwest of Lemont Road between the Des Plaines River and the Chicago Sanitary and Ship Canal. In 1954, the District entered into a 50-year lease for 100 acres in that area, including the 21 acres at issue, with Reclamation Construction Corporation (Reclamation). A subsequent series of subleases and assignments put appellant Du-Kane and Du-Kane's sister corporation, R.W. Dunteman & Company (R.W. Dunteman), in

2

possession of the 21 acres as of 1986. By 1989, there was a dispute amongst some of the subleasees as to which one of them was responsible for the Cook County real estate taxes. In 1994, Reclamation issued a notice to quit and demand for possession and filed an eviction action against several of the subleasees in the circuit court of Cook County. In 1996, while its eviction action was pending, Reclamation sublet the property to Fortech L.L.C. (Fortech), and assigned all its rights to the real property, including its rights in the pending litigation, to Fortech. For reasons that are not made apparent by the record on appeal, Fortech initiated an entirely new eviction action against R.W. Dunteman and Du-Kane in 1996, 96-M1-739824, but continued to pursue the original case, 94-M1-704556.

In the 1996 action, Fortech obtained an order for possession of the premises. The order was entered on May 22, 1997, and, although it specified, "3. Enforcement of this judgment is stayed until June 21, 1997," it is undisputed that as early as May 23, 1997, Fortech's contractor, appellee K-Five, entered the property to begin readying it for Fortech's use. Fortech intended to make "GFRC" or glass fiber reinforced cement products such as architectural cladding, and its operation required a manufacturing facility, a curing shed, and unenclosed curing space. Our own records indicate R.W. Dunteman and Du-Kane filed a notice of appeal in the 1996 action and requested an extension of the stay of execution of the order for possession, but that on

June 8, 1997, this court denied the motion to stay and the appeal was later dismissed without further briefing by the parties. The record on appeal includes a related order entered in the circuit court on July 8, 1997:

"This cause coming on to be heard upon [plaintiff Fortech's] emergency motion to compel defendants [R.W. Dunteman, *et al.*] to remove piles of debris, due notice having been served and the Court being advised: IT IS ORDERED that plaintiff's motion is granted and defendants shall have 10 days or until July 18, 1997 to remove the remaining debris [illegible]. Plaintiff agrees to waive any contempt proceeding [illegible]."

In the 1994 action, Fortech filed a sixth-amended complaint which is still pending in the circuit court. The action was transferred from the circuit court's forcible entry and detainer division to its law division, since Fortech is seeking roughly $300,000 in damages and attorney fees, rather than possession of the property, from R.W. Dunteman, Du-Kane, and corporate officers Paul Dunteman and his brother Allan Dunteman. Fortech's claimed damages include 33 months' back rent accruing between 1994 and 1996, lost profits resulting from Fortech's inability to set up full operations while the defendants' materials remained on the site, the costs of restoring the real property to "good clean and

orderly condition" by removing debris and addressing environmental contamination, and punitive damages for wilfully trespassing.

Du-Kane responded with a counterclaim against Fortech and a third-party complaint against Fortech's contractor, K-Five, which is the third-party action at issue in this appeal. Du-Kane brought claims of conversion and unjust enrichment against both defendants and sought approximately $300,000 in compensation. Du-Kane indicated that R.W. Dunteman is in the business of land excavation and road and highway construction and that Du-Kane operated an asphalt manufacturing and recycling facility on the Lemont property and also maintained stockpiles of its raw materials. Further, however, as Fortech's agent, K-Five entered the land, graded the site, created a road, a parking lot, and an extensive berm, and tortiously incorporated Du-Kane's stockpiles of sand and crushed concrete products into the improvements.

As indicated above, cross-motions for summary judgment were filed. Summary judgment is to be granted "without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2002); *Turner Investors v. Pirkl,* 338 Ill. App. 3d 676, 681, 789 N.E.2d 323, 327 (2003). Summary judgment is considered a drastic measure but is an appropriate means of expeditiously disposing of a lawsuit

1-05-1526

in which the right of the moving party is clear and free from doubt. *Turner Investors*, 338 Ill. App. 3d at 681, 789 N.E.2d at 327. Where reasonable persons could draw divergent inferences from undisputed facts, summary judgment must be denied. *Turner Investors*, 338 Ill. App. 3d at 681, 789 N.E.2d at 327. On November 3, 2003, the circuit court found "there are no facts to establish there was complete abandonment of the [stockpiled] property [by Du-Kane], which then allowed [Fortech] to do what they wanted to do [and use the materials in the improvements it made to the site]." Accordingly, the court granted Du-Kane's motion for summary judgment against Fortech on the unjust enrichment count, found that the value of materials "moved around" the site was $280,800, and entered judgment against Fortech for that amount. However, Du-Kane states in its appellate brief, "The Circuit Court later found that issues of fact remained concerning the exact dollar amount of Du-Kane's damages [for unjust enrichment] and vacated the amount of the award. The judgment against Fortech [as to the elements of unjust enrichment], however, remains." The record on appeal does not disclose why or when the court revisited its unjust enrichment ruling against Fortech.

With respect to Du-Kane's request for summary judgment against Fortech as to the alleged conversion of the stockpiled materials, the court stated, "I think that in my reading through there, there are still some fact issues that aren't resolved.

6

But in view of my [judgment] in favor of Du-Kane on the unjust enrichment, I am not sure whether any further effort [on this additional claim] would be necessary." "And I ask[] quite candidly if the matter is going to proceed to trial, what usefulness would be advanced in doing so when I have already awarded [Du-Kane] something equal to what they claimed in damages."

With respect to Du-Kane's motion for summary judgment as to the two claims directed at Fortech's contractor, K-Five, and K-Five's cross-motion, the court indicated:

> "I am not aware of any case law, nor am I going to take the position that someone who was hired as a contractor could be liable for conversion when the contractor was hired by the person with right of possession.
>
> In my view, the unauthorized control of the property is not established by that fact scenario. Also, I don't believe the evidence indicates that K-Five received any unjust enrichment as a result of this activity, so consequently my ruling is K-Five's motion for summary judgment is granted and the cross motion for Du-Kane for summary judgment on both counts will be denied."

Both parties to this appeal emphasize these remarks, but disagree

on their meaning. According to appellant Du-Kane, the court held an agent cannot be liable for conversion, as indicated by the phrase, "nor am I going to take the position that someone who was hired as a contractor could be liable for conversion." According to appellee K-Five, however, the court was indicating the contractor was not liable for conversion because its principal, Fortech, was "the person with right of possession" to the land and therefore to the materials stored there which K-Five redistributed on the land at Fortech's behest. There was a motion for reconsideration of the summary judgment order entered against Du-Kane and for K-Five, but the record does not disclose why the court denied the motion to reconsider. The record does indicate, however, that Fortech's complaint is still pending and that the District intends to recoup environmental cleanup costs for the Lemont site and was allowed to intervene in the litigation on February 25, 2004. On April 21, 2005, the court entered a Rule 304(a) finding so that this appeal concerning agent K-Five's liability could be taken. 155 Ill. 2d R. 304(a). We review the court's summary judgment ruling *de novo*. *Turner Investors*, 338 Ill. App. 3d at 681, 789 N.E.2d at 327.

As indicated above, Du-Kane's main argument is that the court erroneously determined an agent who converts property at his principal's direction cannot be held liable. Conversion is an unauthorized assumption of the right to possession or ownership of personal property. *Jensen v. Chicago & Western*

8

1-05-1526

*Indiana R.R. Co.*, 94 Ill. App. 3d 915, 932, 419 N.E.2d 578, 593 (1981).  To prove a claim of conversion, the plaintiff must show (1) a right in the property, (2) a right to the immediate possession of the property, which is absolute, unconditional, and not dependent upon the performance of some act, (3) a deprivation of the right by the unauthorized and wrongful assumption of control, dominion, or ownership by the defendant, and (4) a demand for possession of the property.  *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 247, 561 N.E.2d 1245, 1253 (1990); *Jensen*, 94 Ill. App. 3d at 932, 419 N.E.2d at 592-93.

No Illinois court has specifically addressed an agent's liability for committing the tort of conversion at a principal's direction; however, it is a well-settled general proposition that principals and agents are jointly and severally liable for tortious conduct.  *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 25-26, 694 N.E.2d 565, 571-572 (1998) (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.).  Where the principal commands the agent to commit a tort, the principal is liable based on the tort rule "'that one causing and intending an act or result is as responsible as if he had personally performed the act or produced the result.'"  *Buckner*, 182 Ill. 2d at 25, 694 N.E.2d at 572 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.), quoting Restatement (Second) of Agency C 212, Comment *a*, at

9

455 (1958), accord W. Seavey, Agency § 82, at 137 (1964). "The law concerning an agent's liability where the principal commands the agent to commit a tort is equally straightforward." *Buckner*, 182 Ill. 2d at 25-26, 694 N.E.2d at 572 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.). "'The basic proposition concerning the agent's or servant's tort liability is simple and readily stated:  it is normally unaffected by the fact that he is an agent or servant.'" *Buckner*, 182 Ill. 2d at 26, 694 N.E.2d at 603 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.), quoting P. Mechem, Agency § 343, at 232 (4th ed. 1952). The agent's tort liability "'is not based upon the contractual relationship existing between the principal and agent, but upon the common-law obligation that every person must so act or use that which he controls as not to injure another.'" *Buckner*, 182 Ill. 2d at 26, 694 N.E.2d 572 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.), quoting 3 Am. Jur. 2d *Agency* § 309, at 813-14 (1986). "'[W]hether he is acting on his own behalf or for another, an agent who violates a duty which he owes to a third person is answerable to the injured party for the consequences.'" *Buckner*, 182 Ill. 2d at 26, 694 N.E.2d at 572 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.), quoting 3 Am. Jur. 2d *Agency* § 309, at 813-14. "'It is no excuse to an agent that his principal

is also liable for a tort ***.'" *Buckner*, 182 Ill. 2d at 26, 694 N.E.2d at 572 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.),, quoting 3 Am. Jur. 2d Agency Ϲ 309, at 813-14. "'The principal and his agent are jointly and severally liable for all of the damages sustained by the plaintiff.'" *Buckner*, 182 Ill. 2d at 27, 694 N.E.2d at 572 (Freeman, C.J., concurring in part and dissenting in part, joined by Harrison, J.), quoting 1 J. Lee & B. Lindahl, Modern Tort Law Ϲ 7.02, at 187 (rev. ed. 1988).

According to appellant Du-Kane, in a majority of jurisdictions, any person who aids, abets, or assists in the conversion of personal property is liable for all resulting damages, even if the person is not directly benefitted by the tortious act. Du-Kane urges this court to adopt the majority view and find that even if K-Five did not directly benefit from the use of Du-Kane's stockpiled material, K-Five can be held liable for the loss it caused Du-Kane to suffer when it improved the Lemont site with Du-Kane's stockpiles in accordance with Fortech's instructions. We find this argument persuasive.

Du-Kane cites an illustrative case from Vermont, *Murray v. J&B International Trucks, Inc.*, 146 Vt. 458, 508 A.2d 1351 (1986), which involved a truck purchased for use in a log hauling business. The financing company realized the truck buyer's monthly installment payments had been under-calculated and

11

1-05-1526

instructed a Newport, Vermont, truck dealership that was repairing the vehicle to keep it while the financing company tried to negotiate a new payment plan. *Murray*, 146 Vt. at 462, 508 A.2d at 1353. The buyer was not in default and was entitled to possession of the truck. *Murray*, 146 Vt. at 465, 508 A.2d at 1355. The Burlington, Vermont, truck salesman that negotiated the original financing agreement got involved in the attempted renegotiation. *Murray*, 146 Vt. at 462, 508 A.2d at 1353. The buyer balked at the proposed changes and asked to rescind the contract and to regain possession of equipment he attached to the truck for his log hauling business. *Murray*, 146 Vt. at 462, 508 A.2d at 1353. Instead, the financing company and selling dealership took the truck back to Burlington (*Murray*, 146 Vt. at 467, 508 A.2d at 1356) and sold it and the attached equipment to a third party. *Murray*, 146 Vt. at 465, 508 A.2d at 1354. The financing company, the Newport repairing dealership, and the Burlington selling dealership were all found jointly and severally liable for conversion of the truck and the log hauling equipment. *Murray*, 146 Vt. at 463, 508 A.2d at 1354. On appeal from the joint and several judgment, the selling dealership characterized itself as a party that acted in good faith, without intent to injure, for the benefit of the financing company and not for itself. *Murray*, 146 Vt. at 466-67, 508 A.2d at 1356. The Supreme Court of Vermont, however, cited the selling dealership's stake in the financing arrangement and its active

12

participation in the attempted renegotiation and subsequent resale as reasons for affirming the finding of joint and several liability. *Murray*, 146 Vt. at 466-67, 508 A.2d at 1356-57. Of particular relevance here:

> "Furthermore, even if we accept [the selling dealership's] characterization of itself as an [innocent] agent [of the financing company] and not as a principal, this does not make [the dealership] any less liable for the tort of conversion.
>
> An agent who wrongfully convert's another's property, or who assists his principal in so doing, is personally liable for the conversion. [Citation.] This is true even if the agent commits the act in good faith, and without knowledge of the owner's rights, and in obedience to his principal's commands. [Citation.] The agent need gain nothing from the transaction. *Schwartz v. Schartz*, 82 Misc.2d 51, 365 N.Y.S.2d 589, 592 (Sup.Ct. 1975)." *Murray*, 146 Vt. at 467, 508 A.2d at 1356.

One of the opinions the Vermont Supreme Court relied upon was from New York, *Schwartz*, 82 Misc. 2d 51, 365 N.Y.S.2d 589. In *Schwartz*, a mother and daughter opened a joint bank account by

depositing a jointly-owned savings bond. *Schwartz*, 82 Misc. 2d at 52, 365 N.Y.S.2d at 591. The joint account remained relatively inactive for years, until the mother's health was failing and she was ready to enter a nursing home. *Schwartz*, 82 Misc. 2d at 52, 365 N.Y.S.2d at 591. She told her son to close the account and use the proceeds to pay for her nursing care. *Schwartz*, 82 Misc.2d at 52, 365 N.Y.S.2d at 591. He did as he was told. *Schwartz*, 82 Misc. 2d at 52, 365 N.Y.S.2d at 591. He closed the joint account without his sister's knowledge and applied all the funds to his mother's nursing care. *Schwartz*, 82 Misc. 2d at 52, 365 N.Y.S.2d at 591. Even though the son was merely complying with his mother's instructions, did not personally benefit from any of the transactions, and there was no hint of inappropriate spending, undue influence, or fraud, the daughter filed a civil suit and obtained a judgment against her brother for conversion of her half of the joint bank account. *Schwartz*, 82 Misc. 2d at 53-54, 365 N.Y.S.2d at 592-93. His wife was also named as a defendant and suffered the same fate, since her name was on the bank account used to pay the nursing home's bills. *Schwartz*, 82 Misc. 2d at 53, 365 N.Y.S.2d at 592. The appellate court determined:

> "The fact that [the well-intentioned son and
> his wife] did not use the moneys for
> themselves is unavailing. An action in
> conversion lies notwithstanding that the

wrongdoer did not apply the property to his own use [citation]. Thus, an agent is guilty of conversion although he acts in good faith for a principal who receives the benefit." *Schwartz*, 82 Misc. 2d at 53, 365 N.Y.S.2d at 592.

There is also *Continental Supply Co. v. White*, 92 Mont. 254, 12 P.2d 569 (1932), which involved a nonproducing Montana oil well and multiple claimants to 10-inch casing that had been pulled from the well and piled at the site. All of the material at the site was subject to a lien but the unsuccessful drillers sold some of the used oil well casing to McClure. *Continental Supply*, 92 Mont. at 257-58, 12 P.2d at 571. McClure told a supply company to pick up the casing, sell it, pay off McClure's bank debt, and give him any remaining balance. *Continental Supply*, 92 Mont. at 269, 12 P.2d at 575. The supply company did as McClure instructed and was sued by the lienholder for conversion. *Continental Supply*, 92 Mont. at 269, 12 P.2d at 575. After judgment was entered in the lienholder's favor, the supply company took an appeal, arguing that it was shielded by its status as an agent for McClure. *Continental Supply*, 92 Mont. at 269, 12 P.2d at 575. The court rejected this argument, stating, "The fact that one acted as an agent for another in converting the property of a third person is clearly no defense on the part of the agent, even though he acted within the scope of his

1-05-1526

authority and was ignorant of his principal's want of authority."
*Continental Supply*, 92 Mont. at 270, 12 P.2d at 575-76.

Although Du-Kane characterizes these cases as the "majority" view as to an agent's liability for conversion, Du-Kane does not cite and we were unable to find any cases adopting a contrary view. In addition, all of the secondary authority we would refer to in the absence of relevant local or foreign case law also plainly states these principles. See Restatement (Second) of Agency C 349, at 116 (1958) ("An agent who does acts which would otherwise constitute trespass to or conversion of a chattel is not relieved from liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession"); 18 Am. Jur. 2d *Conversion* C 61, at 199 (2004) ("[A]n agent who takes the property of another without consent, and delivers it to a principal, is guilty of conversion and he or she may be held liable although acting in ignorance of the true owner's title and in perfect good faith"); 2A C.J.S. *Agency* C 374, at 636 (2003) ("An agent *** is personally liable for the conversion, even where the agent has committed the act in good faith, in ignorance of the plaintiff's rights in the property, and in obedience to the command of the principal"). Accord, *Forbush v. San Diego Fruit & Produce Co.*, 46 Idaho 231, 249, 266 P. 659, 664 (1928) (with regard to 121,000 pounds of potatoes hauled from ranch to

16

warehouse, court collected cases and stated "[t]he general rule is that an agent, however innocent, who wrongfully interferes with the property of another is liable in conversion").

Thus, if the circuit court's summary judgment ruling in favor of Fortech's contractor K-Five was based on the conclusion that "someone who was hired as a contractor could [not] be liable for conversion," the ruling was erroneous. This conclusion is contrary to Illinois authority cited generally above regarding an agent's liability in tort as well as the foreign and persuasive authority cited above specific to an agent's liability for the tort of conversion.

Moreover, K-Five's argument to the contrary is not supported by the record. K-Five would have us conclude that none of the agency law is relevant because its principal, Fortech, had the right to possess the Lemont site as of May 22, 1997, and therefore the authority to relocate and make use of Du-Kane's stockpiled material when Fortech instructed K-Five to begin readying the site for Fortech's use as of May 23, 1997. K-Five is relying on the notice to quit and demand for possession which Fortech's predecessor, Reclamation, issued to some of the subleasees on January 31, 1994, and the circuit court's order for possession entered on May 22, 1997, in 96-M1-739824. Nothing in the notice to quit and demand for possession entitled Reclamation

or its successor Fortech to ever forcibly take possession of the Lemont property.  "The common law permitted an individual who was rightfully entitled to enter upon land to do so with force and arms and retain possession by force."  *Heritage Pullman Bank v. American National Bank & Trust Co. of Chicago*, 164 Ill. App. 3d 680, 686, 518 N.E.2d 231, 236 (1987).  However, the Forcible Entry and Detainer Act put an end to the practice of self-help and provides the sole means for settling a dispute over possession rights to real property.  735 ILCS 5/9-101 *et seq.* (West 1994); *Heritage Pullman Bank*, 164 Ill. App. 3d at 686, 518 N.E.2d at 236; *Yale Tavern, Inc. v. Cosmopolitan National Bank*, 259 Ill. App. 3d 965, 971, 632 N.E.2d 80, 85 (1994).  "The statute prohibits any actual or constructive self-help through force, including changing locks or locking someone out of his land."  *Yale Tavern*, 259 Ill. App. 3d at 971, 632 N.E.2d at 85. Therefore, while the notice to quit and demand for possession may have been a prerequisite to the filing of the eviction suit and was Fortech's basis for claiming superior entitlement to the real property, the document did not permit Fortech to enter and regain possession of the property through self-help.  In addition, nothing in the order for possession entered on May 22, 1997, entitled Fortech to possess the real property as early as May 23, 1997.  In fact, the order expressly stayed enforcement of the judgment until June 21, 1997.  A stay of enforcement suspends the efficacy of a judgment and temporarily precludes affirmative

action to implement the court's ruling. See *e.g.*, *Gregory v. First National Bank & Trust Co.*, 84 Ill. App. 3d 957, 406 N.E.2d 583 (1980) (divorce judgment eliminated wife's management rights in trust fund, but stay of divorce judgment effectively prevented husband from managing trust fund without wife); Black's Law Dictionary 1425 (7th ed. 2004) (indicating a stay "suspend[s] all or part of a judicial proceeding or a judgment resulting from that proceeding"). Therefore, the court order entitled Du-Kane to retain undisturbed possession of the real property and to continue storing its materials there until at least June 21, 1997. Any entry to the Lemont parcel prior to that date by Fortech or Fortech's agent K-Five in reliance on the court order and without the consent of Du-Kane or R.W. Dunteman was unjustified. Du-Kane's rights did not end upon issuance of the notice to quit and demand for possession, nor upon issuance of the order for possession. Du-Kane's possessory rights persisted pursuant to the May 22, 1997, court order until at least June 21, 1997. In addition, although the record on appeal does not disclose all the circumstances regarding Fortech's subsequent "emergency motion to compel defendants to remove piles of debris," the circuit court order entered on July 8, 1997, expressly states that "defendants shall have 10 days or until July 18, 1997 to remove the remaining debris." We read this statement as indication that the court extended, at least in part, the stay of the execution of the order for possession

19

entered on May 22, 1997.

Because we have rejected K-Five's contention that principal Fortech had the right to possess the Lemont site as of May 23, 1997, we also reject K-Five's related contention that Fortech justifiably directed it to enter the site when it did because Fortech was "obligated by law to remove the Materials in order to mitigate its damages." K-Five relies on *MXL Industries*, which states that a landlord is required to "undertake reasonable efforts to relet the premises following a defaulting tenant's departure from the premises." *MXL Industries, Inc. v. Mulder*, 252 Ill. App. 3d 18, 31, 623 N.E.2d 369, 378 (1993). However, Du-Kane had not "depart[ed] from the premises" when K-Five began disturbing the stockpiled material and Du-Kane was under no legal obligation to depart until at least June 21, 1997.

Similarly, we are not persuaded by K-Five's related contention that Fortech was justified in entering the site as early as May 23, 1997, because Du-Kane appeared to have abandoned the "worthless" materials at issue. K-Five relies on *Michael* for the proposition that "property is abandoned when the owner, intending to relinquish all rights to the property, leaves it free to be appropriated by any other person" (*Michael v. First Chicago Corp.*, 139 Ill. App. 3d 374, 382, 487 N.E.2d 403, 409 (1985)), and also cites *Coleman* for the proposition that intent may be inferred from conduct and circumstances surrounding the

20

incident (*People v. Coleman*, 311 Ill. App. 3d 467, 473, 724 N.E.2d 967, 972 (2000) (indicating the intent element of first degree murder "may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries")). Here, however, since Du-Kane had not left the premises and its stockpiles as of May 23, 1997, there are no circumstances or conduct from which to infer that as of that date, Du-Kane "[left the stockpiles] free to be appropriated by any other person." *Michael*, 139 Ill. App. 3d at 382, 487 N.E.2d at 409. Whether the materials were "worthless" when they were taken is an unresolved question of fact, but lack of value would not justify K-Five's entry to the land and use of materials that the owner could legally store there until at least June 21, 1997.

K-Five also unpersuasively asserts that the present case is "virtually indistinguishable" from *Row v. Home Savings Bank*, 306 Mass. 522, 29 N.E.2d 552 (1940). In *Row*, however, the plaintiff's belongings were discarded after she no longer had a right to occupy the leased premises and was long overdue in collecting her possessions. *Row*, 306 Mass. at 524, 29 N.E.2d at 553. In June 1932, she stopped living in the rented room at issue, moved out most of her belongings, and her landlord closed the building and left it unoccupied. *Row*, 306 Mass. at 523, 29 N.E.2d at 552. Her landlord told her she could use the room for

21

the summer as a writing studio. *Row*, 306 Mass. at 523, 29 N.E.2d at 552. At the end of the summer of 1932, she left, without taking two trunks and a suitcase. *Row*, 306 Mass. at 523, 29 N.E.2d at 552. The plaintiff herself described the trunks as "'old and useful only as repositories,'" and she left one trunk unlocked and the other open. *Row*, 306 Mass. at 523, 29 N.E.2d at 552. The contents of the luggage included photographs, letters, autographs, small antiques, books, china, silver spoons, and silver plated ware. *Row*, 306 Mass. at 523, 29 N.E.2d at 552-23.

In October 1932, her landlord moved out its office furniture and turned off the water service. *Row*, 306 Mass. at 523, 29 N.E.2d at 552. In May 1933, her landlord told her it was abandoning the building and "'everything was going.'" *Row*, 306 Mass. at 524, 29 N.E.2d at 553. The property was in foreclosure. *Row*, 306 Mass. at 523-24, 29 N.E. 2d at 552-53. In June 1933, her landlord moved out the last of its belongings. *Row*, 306 Mass. at 524, 29 N.E.2d at 553. On July 1, 1933, which was more than a year after she used the room as a writing studio, she visited the building, but still did not collect her old luggage. *Row*, 306 Mass. at 524, 29 N.E.2d at 553. After July 13, 1933, the mortgage lender changed the locks, cleaned the building, and threw out the remaining "debris." *Row*, 306 Mass. at 524, 29 N.E.2d at 553. On August 1, 1933, the plaintiff returned to the building and discovered the new state of affairs. *Row*, 306 Mass. at 524, 29 N.E.2d at 553. The appellate court rejected her claim for

conversion because the plaintiff "had no right to continue to keep her property in the building" and the mortgage lender's conduct under the circumstances had been "reasonable." *Row*, 306 Mass. at 526, 29 N.E.2d at 554. The court emphasized that the building had been vacant for a long time, that it was a "common experience" for a foreclosing mortgage lender to find "broken, dilapidated or otherwise worthless furniture, tools or equipment, apparently abandoned by the former occupant," that the property at issue was "reasonably deemed *** worthless" and was unworthy of storage, and that there was little the foreclosing lender could do under the circumstances but discard the property. *Row*, 306 Mass. at 526, 29 N.E.2d at 554. The only similarity *Row* has with the present case is the lengthy prelude to a judicial determination of property rights. Du-Kane still had the right to possess the Lemont parcel and DuKane's property was used to improve the incoming tenant's situation instead of being "discarded." K-Five's citation to *Row* does not persuade us that "there was nothing else that Fortech could have done [under the circumstances] but have K-Five move the Materials."

In short, regardless of whether we accept Du-Kane or K-Five's characterization of the court's summary judgment ruling on the conversion count (whether it was based on K-Five's status as a mere agent or based on K-Five's status as an agent of the party with authority to posses the property), it was erroneous.

Moreover, we are not persuaded that a "demand" for the return of the materials was essential to Du-Kane's claim of conversion. Although "demand" is often cited as the fourth necessary element of a conversion action, demand is unnecessary where "another independent action of conversion is established." *Pavilon*, 204 Ill. App. 3d at 248, 561 N.E.2d at 1253; *Jensen*, 94 Ill. App. 3d at 933, 419 N.E.2d at 593. For instance, in *Pavilon*, the defendant's sale of the office desk at issue to a third person constituted "such an independent act." *Pavilon*, 204 Ill. App. 3d at 248, 561 N.E.2d at 1253. Similarly, in *Jensen*, the defendant's sale of antique steam locomotives and related railcar parts for scrap was deemed an independent act. *Jensen*, 94 Ill. 2d at 933, 419 N.E.2d at 593. The record on appeal indicates that a similar, sufficiently independent act occurred in this case. The deposition transcripts tendered to the circuit court show that K-Five did not merely relocate the piled material to another section of the land or to another site. Instead, K-Five spread the material around the Lemont site and incorporated it into a road, a parking lot, and a broad, windblocking berm. The material that was incorporated into the parking lot and the road was compacted to support the weight of vehicles, and the material that was incorporated into the berm was covered over with black dirt so that it could be landscaped. The raw road construction material that Du-Kane piled on the Lemont property ceased to exist as early as May 23, 1997. Under the

circumstances, a demand was unnecessary for Du-Kane's conversion suit.  We also find that a "demand" was unnecessary in this instance because K-Five's entry to the land and use of the materials was contrary to the court's order for possession of premises.  We are not persuaded that Du-Kane was required to demand that Fortech and K-Five comply with the express terms of the court's order.  Whether the material had the valuable composition that Du-Kane has claimed, or was worthless waste that K-Five has contended, is a unresolved question of fact.

Accordingly, we vacate the circuit court's entry of summary judgment in favor of K-Five and against Du-Kane as to Du-Kane's claim of conversion, and we remand the cause with directions to reconsider the claim in light of our findings, and, if necessary, to conduct further proceedings to resolve any questions of fact regarding the claim.

Appellant Du-Kane's last argument is that it submitted undisputed evidence of K-Five's unjust enrichment.  "A plaintiff may recover under the theory of unjust enrichment if the defendant unjustly retained a benefit to plaintiff's detriment, and '"defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience."'"
 *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 864, 692 N.E.2d 798 (1998), quoting *Alliance Acceptance Co. v. Yale Insurance Agency, Inc.*, 271 Ill. App. 3d 483, 492, 648 N.E.2d 971 (1995), quoting *HPI Health Care Services, Inc. v. Mt. Vernon*

25

*Hospital, Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672 (1989).

Du-Kane cites but one case, *Stathis*, for the proposition that K-Five's intent is irrelevant to this additional claim because "[a] cause of action based upon unjust enrichment does not require fault or illegality on the part of [the] defendants; the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment." *Stathis*, 295 Ill. App. 3d at 864, 92 N.E.2d at 822-83. Du-Kane fails to explain how *Stathis* is factually similar to the present case and, thus, why its analysis and holding are applicable here. In fact, *Stathis* did not engage in any relevant analysis -- immediately after stating the principle Du-Kane is relying upon, the court indicated the parties' rights were governed by an express contract, and therefore, the quasi- or implied contract doctrine of unjust enrichment "ha[d] no application" to their dispute. *Stathis*, 295 Ill. App. 3d at 864, 92 N.E.2d at 823. Du-Kane's failure to cite relevant authority is a violation of Rule 341(e)(7) and waives consideration of its unjust enrichment claim. 155 Ill. 2d R 341(e)(7); *Washington v. Caseyville Health Care Ass'n*, 284 Ill. App. 3d 97, 102, 672 N.E.2d 34, 37 (1996). Accordingly, we affirm the entry of summary judgment in favor of K-Five and against Du-Kane as to Du-Kane's claim of unjust enrichment.

Affirmed in part and vacated in part; remanded with directions.

1-05-1526

GORDON and BURKE, JJ., concur.